Jonathon A. Talcott (030155)
talcottj@ballardspahr.com
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400
Facsimile: 602.798.5595

Karla M. Vehrs (*Pro Hac Vice* Forthcoming)
vehrsk@ballardspahr.com
Conor H.M. Smith (*Pro Hac Vice* Forthcoming)
smithchm@ballardspahr.com
BALLARD SPAHR LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
Telephone: 612.371.3211
Facsimile: 612.371.3207

*Attorneys for Plaintiff Calyxt, Inc.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Calyxt, Inc., | No._____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Morris Ag Air & Sons, Inc.; Morris Ag Air Southwest, LLC; Amigo Farms, Inc.; Jeffrey Nigh, an individual; Tri-Rotor, L.L.C.; Tri-Rotor Ag Services, Inc.; Jonhenry Luke, an individual; and D'Arrigo Brothers Company, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Calyxt, Inc. ("Calyxt") hereby pleads the following claims against Defendants for strict liability, negligent trespass, negligence *per se*, and private nuisance arising under Arizona common law, and for violations of Arizona Revised Statutes §§ 3-114 and 3-367. These claims arise from Defendants' unlawful actions relating to the aerial application of certain chemicals that caused extensive damage to Calyxt's high fiber wheat crops growing for research and commercial development purposes on two fields in or near Yuma, Arizona. For its Complaint, Calyxt alleges as follows:

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

**NATURE OF THE ACTION**

1.      This is an agricultural dispute arising under Arizona statutory and common law. It is based on the unlawful acts of aerial applicators, their pest control advisors, and produce growers who recklessly undertook the aerial application of chemical herbicides near fields where Calyxt was growing highly valuable wheat crops susceptible to those herbicides.

2.      Due to weather, aerial application, proximity, and/or other adverse conditions about which Defendants knew or should have known, Defendants' herbicides that were intended to be applied to Defendants' leaf lettuce crops drifted onto Calyxt's fields. These actions caused extensive damage to Calyxt's innovative, high fiber wheat crop—a result that was entirely foreseeable to Defendants because wheat is a type of grass, and the chemical they applied is specifically intended to kill grasses. Accordingly, as alleged herein, Defendants are individually, jointly, and severally liable to Calyxt for these actions in violation of Arizona law.

**THE PARTIES**

A.      **Plaintiff Calyxt, Inc.**

3.      Plaintiff Calyxt, Inc. ("Calyxt") is an agriculture technology company focused on delivering plant-based solutions that are healthy and sustainable using proprietary gene-editing technology.  Calyxt is a Delaware corporation with its principal place of business located at 2800 Mount Ridge Rd., Roseville, MN 55113.

B.      **The Morris Defendants**

4.      Defendant Morris Ag Air Southwest, LLC ("Morris Ag Air Southwest") is an aerial applicator of agricultural pesticides and is organized as a limited liability company under the laws of the State of Arizona, with its principal place of business located at 6277 W County 12th Street, Yuma, AZ 85365. Miles Morris is the only member of Morris Ag Air Southwest and, on information and belief, is an Arizona citizen with a permanent residence located at 340 W 32nd Street #413, Yuma, AZ 85364.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

1

5.      Defendant Morris Ag Air & Sons, Inc. ("Morris Ag Air & Sons") is also an aerial applicator, and an Arizona corporation sharing the same principal place of business as Morris Ag Air Southwest, LLC, located at 6277 W County 12th Street, Yuma, AZ 85365.

6.      On information and belief, Defendants Morris Ag Air Southwest and Morris Ag Air & Sons (collectively, "Morris Ag Air") are alter egos and agents of each other, acting on each other's behalf with a unity of interest and ownership, such that observance of their separate corporate forms would promote injustice. As such, the Morris Ag Air defendants are jointly, severally, and vicariously liable for each other's actions and for the claims against them as alleged herein. Miles Morris is the statutory agent for both of these companies, he is the sole member of Morris Ag Air Southwest, and, on information and belief, his close relatives, Michael and Michelle Morris, are the officers and directors of Morris Ag Air & Sons. Defendants Morris Ag Air Southwest and Morris Ag Air & Sons also share a common address for their principal places of business.

7.      Defendant Amigo Farms, Inc. ("Amigo Farms") is a grower of agricultural produce and is an Arizona corporation with its principal place of business located at 4245 East 32nd Street, Yuma, AZ 85365. On information and belief, Amigo Farms leases and grows crops on fields located in and near Yuma, Arizona.

8.      Defendant Jeffrey Nigh ("Nigh") is an individual who is a Pest Control Advisor ("PCA") with Arizona PCA License No. 3464. On information and belief, at all relevant times, Nigh is and has been a citizen of Arizona, with a permanent residence in or near Yuma, AZ.

9.      Collectively, Morris Ag Air, Amigo Farms, and Nigh shall be referred to herein as the "Morris Defendants."

**C.      <u>The Tri-Rotor Defendants</u>**

10.     Defendant Tri-Rotor, L.L.C. ("Tri-Rotor, L.L.C.") is an aerial applicator of pesticides, organized as a limited liability company under the laws of the State of Arizona, with its principal place of business located at 18679 South Avenue D, Somerton, AZ 85350.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

11.     Defendant Tri-Rotor Ag Services, Inc. ("Tri-Rotor Ag Services") is an aerial applicator and Arizona corporation sharing the same principal place of business as Tri-Rotor, L.L.C., located at 18679 South Avenue D, Somerton, AZ 85350.

12.     On information and belief, Defendants Tri-Rotor, L.L.C. and Tri-Rotor Ag Services (collectively, "Tri-Rotor") are alter egos and agents of each other, acting on each other's behalf with a unity of interest and ownership, such that observance of their separate corporate forms would promote injustice. As such, the Tri-Rotor defendants are jointly, severally, and vicariously liable for each other's actions and for the claims against them as alleged herein. Matt Fieldgrove is the statutory agent for both of these companies and a director at Tri-Rotor Ag Services, which is the sole member of Tri-Rotor L.L.C. The businesses also share a common address for their principal places of business.

13.     Defendant D'Arrigo Brothers Company of California ("D'Arrigo Brothers") is a grower of agricultural produce and is a California corporation with a principal place of business located at 21777 Harris Road, Salinas, CA 93908. On information and belief, D'Arrigo Brothers leases and grows crops on fields located in and near Yuma, Arizona.

14.     Defendant Jonhenry Luke ("Luke") is an individual who is a Pesticide Control Advisor with Arizona PCA License No. 3773. On information and belief, at all relevant times, Luke is and has been a citizen of Arizona with a permanent residence in or near Yuma, AZ.

15.     Collectively, Tri-Rotor, D'Arrigo Brothers, and Luke shall be referred to herein as the "Tri-Rotor Defendants."

## JURISDICTION AND VENUE

16.     This is a civil action regarding Defendants' unlawful actions relating to the aerial application of chemical herbicides that drifted onto fields where Calyxt was growing high fiber wheat crops. This action arises under Arizona statutory and common laws created to protect innocent parties against the inherently dangerous aerial application of such chemical herbicides.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

17.     Complete diversity exists between Calyxt and Defendants. As set forth above in Paragraphs 4-15, none of the Defendants are citizens of Delaware or Minnesota. Pursuant to 28 U.S.C. § 1332(c)(1), Calyxt is a citizen of Delaware, where it is incorporated, and Minnesota, where its principal place of business is located. The Morris Defendants are all citizens of Arizona. Except for D'Arrigo Brothers, which is a citizen of California, the Tri-Rotor Defendants are all citizens of Arizona. The amount in controversy far exceeds $75,000.00, exclusive of interest and costs. Thus, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

18.     The Court has personal jurisdiction over Defendants pursuant to the Due Process Clause of the United States Constitution and pursuant to Arizona's long-arm statute, ARIZ. R. CIV. P. 4.2(a), as follows.

19.     The Court has general personal jurisdiction over Defendants because, on information and belief, Defendants have conducted substantial and continuous business in, and have substantial and continuous contact with, the District of Arizona. Among other things, Defendants conduct regular agricultural-related business within Arizona and, in particular, in and around Yuma, Arizona. All of the Defendants are citizens of Arizona except for D'Arrigo Brothers, which is a citizen of California. On information and belief, D'Arrigo Brothers also conducts substantial agricultural business in Arizona, including in Yuma.

20.     The Court also has specific personal jurisdiction over Defendants. As alleged herein, each of the Defendants has undertaken actions relating to farmland that they owned, operated, and/or sprayed with chemical herbicides that drifted onto the two Calyxt fields located in Yuma, Arizona, resulting in the destruction of significant portions of Calyxt's valuable high fiber wheat crops. These acts give rise to Calyxt's claims.

21.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the acts and events giving rise to Calyxt's claims occurred in this judicial district, and the property damaged as a result of those acts is located in this judicial district.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

# FACTUAL BACKGROUND

### A.   Background on Plaintiff Calyxt and the Gene-Edited Food Industry

22.   The food industry recently has experienced unprecedented growth in demand from consumers for products that support healthier eating, improved traceability and global sustainability. These demands for sourcing, transparency, traceability, environmental impact, and climate impact data have in turn contributed to a rapidly expanding market for nutritionally enhanced plant-based food products.

23.   Calyxt is a leading agricultural technology company that delivers products that satisfy the aforementioned unique consumer demands. Founded in 2010 and headquartered in Roseville, Minnesota, Calyxt specializes in delivering plant-based solutions that are healthy and sustainable. Using its proprietary technologies and expertise, including its exclusively licensed in the field of plants transcription activator-like effector nuclease (TALEN®) gene-editing technology, Calyxt develops crops with targeted traits more quickly and cost effectively than through traditional methods.

24.   Among other advantages, Calyxt's proprietary technologies and intellectual property enable it to edit the plant genome by knocking out genes or making precise gene edits. Calyxt leverages its expertise in plant gene function to identify and select beneficial genetic variations that improve nutritional and other traits of value.

25.   An uninterrupted product development process is critical to the success of Calyxt's highly specialized products. Generally, Calyxt's product development cycle includes ideation, discovery, and three development phases before a product is commercialized.  The following image at the top of the next page illustrates key activities in Calyxt's product development cycle:

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555



26.    Ideation, Discovery and Phase 1 may take several years and begin with an idea. Calyxt identifies the type of plant product (e.g., soybean, wheat, or alfalfa), the desired beneficial traits, and the specific genes to edit. Once the target plant and editing are determined, Calyxt edits the plant cells in the laboratory. Ultimately, initial sets of plants are grown in a greenhouse to create additional seeds. Calyxt also undertakes the resource-intensive process of submitting information to the U.S. Department of Agriculture ("USDA") to determine whether its product will be subject to USDA regulation.

27.    During Phase 2, Calyxt plants its initial sets of gene-edited seeds in the field to grow additional plants. In turn, these plants create additional seeds that Calyxt continues to subject to ongoing plant breeding techniques in an effort to focus and improve their traits. Plant breeding is similar to a funnel or screening process. Calyxt begins with a large number of plant or seed varieties, then narrows that number during the selection process to identify and select for optimal characteristics, including nutritional properties, utility for different applications, ability to withstand disease and pest pressures, and yield. During this breeding process, Calyxt must generate enough viable seeds of whichever variety it determines has optimal traits for marketing and commercializing. At this stage, Calyxt must have sufficient viable seeds to plant field trials needed for submitting data to the U.S. Food and Drug Administration ("FDA") as part of Calyxt's consultation with FDA for the product's use in food and feed (Phase 3).

28.    Phase 3 of the gene-edited product development process includes successfully completing consultation with the FDA, developing the first commercial-scale pilot production, and performing final testing prior to commercialization.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

29.     The final stage is commercialization, where the product is commercially planted by farmers and the resulting crop is used for food and/or feed.

30.     Calyxt has already demonstrated success using the foregoing process. In early 2019, Calyxt brought to market a high oleic soybean oil product that delivers superior nutritional and functional benefits, including zero trans-fat per serving and 20% reduced saturated fat. This premium oil is a healthier alternative to standard vegetable oils used for fried food and in other cooking. Calyxt's high oleic soybean was the first gene-edited food product commercialized in the United States.

**B.     Calyxt's High Fiber Wheat Project and the Yuma Fields**

31.     Wheat is a type of grass and is the third largest commodity crop in the United States. In 2019 alone, the U.S. marketplace for wheat was estimated to be $8.6 billion dollars. Fiber is a key nutritional attribute of wheat, because fiber is the indigestible portion of food that is essential for maintaining healthy digestion. In recent years, consumers have grown increasingly mindful of the health benefits of high fiber diets, including the important role it can play in preventing chronic health conditions. This has translated to a strong growth in demand for high fiber food products.

32.     In 2015, leveraging its innovative TALEN® gene-editing technology, Calyxt began developing a groundbreaking high fiber wheat product. Superior to other wheat products, Calyxt's high fiber wheat can be used to produce white flour with up to three times more dietary fiber than standard white flour (a 10% increase in nutritional daily value), all while maintaining the same flavor and convenience of use (hereafter, the "High Fiber Wheat" or "HFW" product or project).

33.     Calyxt completed Phase 1 of the development process for its HFW product in approximately March 2018, which is when it received confirmation from the USDA that the USDA deemed its HFW non-regulated. Confirmation that Calyxt's HFW product is deemed non-regulated by the USDA paved the way for Calyxt to conduct field trials (as opposed to in the laboratory) and continue optimizing its product for commercialization.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

34.     Beginning in spring 2018 and continuing through fall harvest of 2019, Calyxt grew small quantities of seeds in Calyxt's greenhouse and in test plots at the University of Minnesota. Test plots are small in-field plantings for evaluation purposes. The quantity of seed is multiplied each growing cycle as the plants produce seeds.

35.     In October 2019, Calyxt continued to progress in Phase 2 of its HFW product development by planting field trials of increasing size. Calyxt planned for HFW seed harvested from the October 2019 planting to be used in field trials to generate data for submission to FDA.

36.     Because of the area's superior climate and growing conditions, Calyxt chose to plant its HFW seeds in the area of Yuma, Arizona. Calyxt engaged an experienced crop research organization called Second Nature Research, LLC ("SNR") to identify suitable fields in the Yuma area. SNR selected two fields in Somerton, Arizona, which are located and identified, respectively, as follows:

(1) South of the intersection of County Road 19 and Avenue G with Township, Range and Section coordinates of T10S R24W S21 ("**Field 1**"); and

(2) 11492 South Avenue D with Township, Range and Section coordinates of T09S R24W S12 ("**Field 2**").

37.     SNR initially planted 497 lines of Calyxt's HFW seeds on Field 1 and 200 lines of its HFW seeds on Field 2. Each "line" of Field 1 contained forty-five seeds (three-row plots of fifteen seeds each), while each line of Field 2 contained fifteen seeds (one-row plots of fifteen seeds each). Thus, the total number of Calyxt's HFW seeds initially planted in the Yuma area was 25,365 (22,365 in Field 1 and 3,000 in Field 2). Each of the 697 lines of seeds planted is unique, reflecting slight variations in genetic makeup and expressed traits.

38.     Calyxt's    ability    to    achieve    its    development    milestones    and commercialization of its HFW products depends on obtaining enough seeds from among the many different lines in this planting. This is because Calyxt's product development cycle requires it to assess the attributes of each line and to continue to narrow its focus to

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

those lines exhibiting the most desirable qualities. This uninterrupted optimization process is crucial to the success of Calyxt's gene-edited products, including the HFW products.

39.     As of early November 2019, all aspects of the HFW project were on track, and the HFW plants in Yuma were just beginning to emerge from the soil as expected.

40.     In April 2020, Calyxt harvested the remnants of the 697 lines of HFW plants that were allowed to grow out.

41.     As of the date of filing this Complaint, Calyxt has confirmed that, as a result of chemical herbicide damage, the yield from the HFW plants was severely reduced, with some seed varieties completely destroyed, and others severely reduced.

**C.     Defendants' Improper Application of Herbicides in November 2019**

42.     Defendants Morris Ag Air and Tri-Rotor (collectively, the "Applicator Defendants") are each what is known in the agricultural industry as an "aerial applicator." An aerial applicator sprays chemicals from an airplane flying at low altitudes over a farm field. These chemicals are formulated for the very purpose of killing unwanted pests and plants that could otherwise threaten the crops growing in the field. The chemicals are known as pesticides.

43.     Arizona law defines "pesticides" as "any substance or mixture of substances intended to be used for defoliating plants or for preventing, destroying, repelling or mitigating insects, fungi, bacteria, weeds, rodents, predatory animals or any form of plant or animal life which is, or which the director may declare to be, a pest which may infest or be detrimental to vegetation, humans, animals, or households or which may be present in any environment." A.R.S. § 3-341(20). A herbicide is a substance that is toxic to plants and used to destroy unwanted vegetation. Thus, "pesticides" under Arizona law and as referenced herein include herbicides as a type of pesticide.

44.     Defendants Amigo Farms and D'Arrigo Brothers (collectively, the "Grower Defendants") grow leaf lettuce on fields adjacent to the fields in which the Calyxt HFW was growing. Upon information and belief, the Grower Defendants hired, contracted with, or otherwise engaged the Applicator Defendants to spray their respective fields with

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

pesticides in order to prevent the growth of unwanted grasses. *See* Ariz. Admin. Code R3-3-101 (definition of "Regulated Grower").

45.     Either alone or acting in concert with the Applicator Defendants, the Grower Defendants hired, contracted with, or otherwise engaged agricultural pest control advisors, Nigh and Luke (collectively, the "PCA Defendants"). The PCA Defendants then actively participated in advising and providing instructions to the Grower Defendants and/or Applicator Defendants regarding the selection, control, and application of the pesticides. *See* Ariz. Admin. Code R3-3-101 (definition of "PCA").

46.     Aerial application of pesticides is an inherently dangerous activity. Pesticides are by their nature intended to be lethal to insects and plants. They are comprised of dangerous chemicals that pose grave risks to the health and safety of animals, humans, and plants. For this reason, pesticides are heavily regulated by both federal and state law, which among other things require their labels to contain extensive warnings regarding their hazards and corresponding use restrictions.

47.     Spraying these dangerous chemicals into the air using a low-flying airplane serves only to exacerbate the risks. Among other risks, the aerial application of pesticides can lead to "drift" (or overspray), whereby pesticides intended to be sprayed onto a target location drift away from that location and onto off-target locations, thereby threatening the lives of plants, people, animals, and property located there. Drift can occur either during pesticide application, or after the application, when certain chemicals become vapors that can move off-site.

48.     Some factors that may affect the risks posed by aerial pesticide application include, among other things, the addition of thickening agents (also known as drift mitigation adjuvants), changes in applicator nozzle configurations or settings, local weather conditions, choice of flight path, and time of day.

49.     Due to the inherent dangers posed by aerial pesticide application, courts hold the target field's grower vicariously liable for damage resulting from the aerial application of pesticides on the grower's field. These courts reason that growers should not be able to

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

escape liability by outsourcing such extra-hazardous work on their land, even to independent contractors, because of the very high likelihood and well-known risks that toxic pesticides will drift to adjoining or nearby premises and damage valuable property located on it.

50.     Those inherent dangers have led the United States Environmental Protection Agency ("EPA") to strictly regulate pesticides, and particularly their labeling. The EPA's Label Review Manual, for example, states that "Pesticide product labels provide critical information about how to safely and legally handle and apply pesticides. . . . A critical function of the label is to translate the results of the science evaluations into a set of conditions, direction, precautions, and restrictions that define who may use a pesticide, as well as where, how, how much, and how often it may be used." EPA regulations further provide that "[i]t is a violation of Federal law to use [pesticides] in a manner inconsistent with [their] labeling." 40 CFR § 156.10(i)(h)(iii)(4)(C)(2)(ii).

51.     Additionally, because of the severe safety risks and potential damage posed by pesticide application, Arizona has joined other states in heavily regulating them and allocating the risk of loss to the parties involved in selecting and applying the pesticides. For example, Arizona requires growers, pesticide applicators, and agricultural pest control advisors (PCAs) to register pesticides and to meet stringent licensing requirements before using, selling, or applying pesticides. Arizona also imposes strict fines for using or instructing another to apply pesticides in a manner that is inconsistent with their labeling, allows drift onto neighboring fields, or that otherwise causes adverse effects to property, persons, and animals. *See generally, e.g.*, A.R.S. Title 3, Chapter 2, Articles 5-6; Ariz. Admin. Code Title 3, Articles 1-5.

52.     To comply with safety application restrictions, PCAs and growers are required to provide a "Form 1080" to aerial applicators, which provides information and instructions for spraying their fields with pesticides. After completing the aerial application, the applicator must also sign the Form 1080 and report it to the Arizona

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

Department of Agriculture. *See, e.g.*, Ariz. Admin. Code Rules R3-3-301, R3-3-302, R-3-404.

53.     On or about November 21, 2019, Morris Ag Air aerially applied pesticides to a field located near Field 1 where Calyxt's HFW plants were growing. The applicable Form 1080 providing details concerning this aerial application is attached to this Complaint as **Exhibit A** (hereafter, the "Morris 1080").

54.     As the Morris 1080 states, Morris Ag Air sprayed a field located at Site ID Y-9-2, on which grower Amigo Farms was growing "lettuce leaf." Among other chemicals, Morris Ag Air sprayed the Amigo Farms field with a pesticide branded Select Max®, whose active ingredient is Clethodim.

55.     Clethodim is a pesticide that is formulated to target and selectively kill grasses, including wheat, while at the same time it is non-toxic to lettuce leaf. As the EPA-mandated product labeling and other documentation for the Select Max® product warns, Select Max® poses significant risks to adjacent land and crops. Applicators of this pesticide are required to take extraordinary precautions to avoid drift: specifically to do "everything possible" to reduce spray drift and not to apply it "under conditions involving possible drift to food, forage or other plantings that might be damaged or the crops thereof rendered unfit for sale, use or consumption."

56.     The product label for Select Max®, attached to this Complaint as **Exhibit B** (hereafter the "Select Max Label"), specifically states:

> • Do not allow spray from ground or aerial equipment to drift onto adjacent land or crops. When drift may be a problem, do everything possible to reduce spray drift, including:
>
> • Do not apply when conditions are favorable for drift (high temperatures, drought and low relative humidity), especially when sensitive plants are located nearby.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

• Do not spray if wind speed is 10 mph or greater. If sensitive crops or plants are downwind, extreme caution must be used under all conditions.

• Do not spray if winds are gusty.

• Do not apply when a temperature inversion exists. If inversion conditions are suspected, consult with local weather services before making an application.

• Do not allow Select Max Herbicide with Inside Technology to come in contact with desirable grass crops such as corn, rice, small grains, sorghum or turf, as these and other grass crops will be injured or killed.

57.     On information and belief, the Morris Defendants did not exercise reasonable care when applying Select Max® to the Amigo Farms field on November 21, 2019. Among other improper actions, on information and belief, the Morris Defendants did not select or provide proper advice concerning an appropriate pesticide or chemical mix; did not add proper thickening agents to the pesticide chemical being sprayed; made improper changes to the applicator nozzle configurations or settings; failed to investigate neighboring fields and susceptible crops located thereon; did not have the proper spotters for identifying nearby hazards; disregarded local weather conditions (e.g., a temperature inversion); and/or undertook an improper flight path and inappropriate time of day to apply the pesticide.

58.     Under these conditions, the Morris Defendants knew or should have known that there was a significant risk that Select Max® (and Clethodim) would drift onto Field 1 and cause damage to the Calyxt HFW. The Morris Defendants applied Select Max® despite this risk.

59.     On or about November 27, 2019, Tri-Rotor aerially applied pesticides to a field located near Field 2 where Calyxt's HFW plants were growing. The applicable Form 1080 providing details concerning this aerial application is attached to this Complaint as **Exhibit C** (hereafter, the "Tri-Rotor 1080").

13

60.     As the Tri-Rotor 1080 states, Tri-Rotor sprayed a field located at Site ID 68402, on which grower D'Arrigo Brothers was growing "lettuce leaf." Among other pesticide chemicals, Tri-Rotor sprayed the D'Arrigo Brothers field with a pesticide branded "Intensity® One," whose active ingredient—just like the Select Max® sprayed by Morris Ag Air—is Clethodim, which is used to kill grasses, including wheat. As with Select Max®, product labeling and other documentation for Intensity® One provides extensive warnings that it poses significant risks to adjacent land and crops, specifying various restrictions and directing applicators to "minimize" and avoid drift to off-target plants such as grass crops, which includes wheat.

61.     The product label for Intensity® One, attached to this Complaint as **Exhibit D**, specifically states:

> THE APPLICATOR IS RESPONSIBLE FOR AVOIDING OFF-SITE SPRAY DRIFT. BE AWARE OF NEARBY NON-TARGET SITES AND ENVIRONMENTAL CONDITIONS.
>
> • Desirable grass crops such as corn, rice, grains, sorghum, turf or other grass crops will be injured or killed if they come in contact with Intensity® One Post-Emergence Grass Herbicide.
>
> • Drift onto food, forage or other plantings may render them unfit for sale, use or consumption.
>
> • Do not apply during temperature inversions.

62.     On information and belief, the Tri-Rotor Defendants did not exercise reasonable care when applying Intensity® One to the D'Arrigo Brothers field on November 21, 2019. Among other improper actions, on information and belief, the Tri-Rotor Defendants did not select or provide proper advice concerning an appropriate pesticide or chemical mix; did not add proper thickening agents to the pesticide chemical being sprayed; made improper changes to the applicator nozzle configurations or settings; failed to investigate neighboring fields and susceptible crops located thereon; did not have the proper spotters for identifying nearby hazards; disregarded local weather conditions

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

(e.g., a temperature inversion); and/or undertook an improper flight path and inappropriate time of day to apply the pesticide.

63.    Under these conditions, the Tri-Rotor Defendants knew or should have known that there was a significant risk that Intensity® One (and Clethodim) would drift onto Field 2 and cause damage to the Calyxt HFW. The Tri-Rotor Defendants applied Intensity® One despite this risk.

**D.    The Extensive Damage to Calyxt's HFW Caused By the Defendants**

64.    It takes time for the effects of improper pesticide application to manifest. Calyxt did not begin to learn of any damage to its HFW crops until January 2020. By then, it was too late to replant any additional HFW seed for the season and too late to bring its HFW products to market as originally planned. The full magnitude of damage to the HFW crops is still being determined as of the filing of this Complaint.

65.    The photographs of Field 1 and Field 2 attached as **Exhibit E** demonstrate some of the damage to the Calyxt HFW crops.

66.    These images reveal that the cause of damage to the HFW crops on Fields 1 and 2 was pesticide drift from the fields intended to be sprayed by Defendants. The damage to the HFW crops is consistent with the damage that would be expected from the application of Clethodim to wheat, because wheat is a type of grass and Clethodim it is specifically formulated to kill grasses. Such damage would not ordinarily occur absent negligent application of pesticide to nearby fields and pesticide drift onto the HFW crops. Calyxt is aware of no other possible causes of this damage other than the Defendants' aerial application of Clethodim.

67.    For example, Calyxt HFW crops growing on Field 1 exhibit a pattern of dead crops, distress, and other damages that increase when traversing from the south end of Field 1 to the north end of Field 1. This pattern conclusively shows that the pesticide causing damage to the HFW crops drifted from a target field located directly to the north of Field 1, which is consistent with the information provided on the Morris 1080.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

68.     Similarly, Calyxt HFW crops growing on Field 2 exhibit a pattern of dead crops, distress, and other damages that increase when traversing from the east end of Field 2 to the west end of Field 2. This pattern conclusively shows that the pesticide causing damage to the HFW crops drifted from a target field located directly to the west of Field 2, which matches the information provided on the Tri-Rotor 1080.

69.     In addition, because the result of Clethodim application was to kill the plants it came into contact with, Calyxt can deduce the approximate date of application based on how large the plants had grown when they were killed. The damage to the HFW crops on both Field 1 and Field 2 is consistent with the application dates listed on the Morris 1080 and the Tri-Rotor 1080, respectively.

70.     Fulfilling its obligations under A.R.S. § 3-367.01, Calyxt timely submitted written reports to the Arizona Department of Agriculture, alerting the Department to the HFW crop damages to Field 1 and Field 2 on February 3 and February 10, 2020, respectively. As required, Calyxt sent copies of these notices to the applicators causing this damage, Morris Ag Air and Tri-Rotor. Nevertheless, on information and belief, neither Morris Ag Air nor Tri-Rotor took any action in response to these notifications.

71.     While Calyxt is still assessing the full extent of its damages, at least 60% of the 697 seed varieties of HFW seeds have been substantially destroyed. This has resulted in a significant reduction in the number of seed varieties and thus the diversity of the genetic population available to Calyxt for the additional selective breeding, which cannot be replaced and is critical to Calyxt achieving a successful HFW product. This, in turn, will cause significant delay in Calyxt's ability to bring its HFW product to market, significantly decrease the quality of the HFW product, and/or result in a diminished ability to generate revenue from its commercialization.

\*        \*        \*

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

## COUNT I

### Strict Liability

### (All Defendants)

72.     The foregoing paragraphs are incorporated by reference.

73.     Defendants were engaged in the inherently dangerous activity of aerially applying pesticides in fields that were close in proximity to Calyxt's High Fiber Wheat crops.

74.     Defendants' actions destroyed a significant portion of Calyxt's High Fiber Wheat crops.

75.     As a result, Calyxt has suffered consequent and proximate damages in an amount to be determined at trial.

76.     Defendants are strictly liable for these actions.

## COUNT II

### Negligent Trespass

### (All Defendants)

77.     The foregoing paragraphs are incorporated by reference.

78.     Defendants had a duty to act reasonably when aerially applying pesticides, as a reasonably prudent person would expect that damage to neighboring properties could result.

79.     Defendants breached their duty by, among other improper actions, failing to select or provide proper advice concerning an appropriate pesticide or chemical mix; failing to add proper thickening agents to the pesticide chemical being sprayed; making improper changes to the applicator nozzle configurations or settings; failing to investigate neighboring fields and susceptible crops growing thereon; failing to have the proper spotters for identifying nearby hazards; disregarding local weather conditions (e.g., a temperature inversion); undertaking an improper flight path; and/or applying the herbicide at an improper time of day.

17

80.    Calyxt has suffered consequent and proximate damages as a result of Defendants' actions in an amount to be determined at trial, for example, through destruction of a significant portion of Calyxt's High Fiber Wheat crops.

81.    Alternatively, the drift of pesticide and resulting damage to Calyxt occurred as a result of instrumentalities that were under Defendants' exclusive control, including but not limited to the pesticide and the aerial application equipment. In the normal course of events, the drift of pesticide would not have occurred unless Defendants were negligent. Calyxt is not otherwise in a position to show the particular circumstances which caused the drift of herbicide onto Calyxt's fields.

**COUNT III**

**Negligence *Per Se***

**(All Defendants)**

82.    The foregoing paragraphs are incorporated by reference.

83.    By engaging in or otherwise causing the application of a pesticide in a manner resulting in drift and damage to Calyxt's High Fiber Wheat crops, the Grower, Applicator, and PCA Defendants individually and jointly violated the following Arizona statutes and regulations, which were enacted to govern the safe application of herbicides in order to protect growers of crops such as Calyxt and other persons located nearby the field to which the pesticide was intended to be applied:

a.    A.R.S. § 3-114;

b.    A.R.S. § 3-367;

c.    Ariz. Admin. Code R3-3-301(A) ("A person shall not use, apply, or instruct another to apply a pesticide in a manner for a use inconsistent with the pesticide labeling . . . .");

d.    Ariz. Admin. Code R3-3-301(D) ("A person shall not allow drift that causes any unreasonable adverse effect.");

e.    Ariz. Admin. Code R3-3-301(E) ("A person shall not cause the direct release of a pesticide and an individual shall not instruct an applicator in a manner

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

to cause the direct release of a pesticide causing any unreasonable adverse effect.")

    f.   Ariz. Admin. Code R3-3-502(A)(5)(c) (listing as violation the application of a pesticide that comes into contact with "[p]roperty, other than the application site being treated");

    g.   Ariz. Admin. Code R3-3-502(A)(6) ("Use, apply or instruct another to apply pesticide in a manner or for a use inconsistent with its pesticide label or labeling . . . .")

84.    The Applicator Defendants further violated Ariz. Admin. Code R3-3-502(A)(4) and R3-3-502(E)(1) by operating an aircraft in a faulty, careless, or negligent manner during the application of a pesticide, for which the Grower Defendants are vicariously liable.

85.    The PCA Defendants further violated Ariz. Admin. Code R3-3-502(C)(4) by making a written recommendation for the use of a pesticide in a manner inconsistent with its pesticide label not falling under any exception listed by R3-3-301(A).

86.    The Grower, Applicator, and PCA Defendants' violations of these statutes and regulations resulted in their pesticides drifting onto Calyxt's fields and onto the HFW Crops.

87.    Calyxt has suffered consequent and proximate damages as a result of Defendants' actions in an amount to be determined at trial, for example, through destruction of a significant portion of Calyxt's High Fiber Wheat crops.

**COUNT IV**

**Private Nuisance**

**(All Defendants)**

88.    The foregoing paragraphs are incorporated by reference.

89.    The improper imposition of herbicides upon Calyxt's fields occurred on or about November 21, 2019 and November 27, 2019.

90.    Defendants strictly, unreasonably, and/or intentionally caused, created or contributed to this condition by engaging in or otherwise causing the inherently, abnormally dangerous, and ultra-hazardous activity of aerially applying pesticides.

91.    The condition unreasonably interfered with Calyxt's use and enjoyment of its High Fiber Wheat property on Field 1 and Field 2.

92.    The interference with Calyxt's use and enjoyment of property is substantial, preventing Calyxt from growing its High Fiber Wheat crops as intended.

93.    Calyxt has suffered consequent and proximate damages as a result of Defendants' actions in an amount to be determined at trial, for example, through destruction of a significant portion of Calyxt's High Fiber Wheat crops.

## COUNT V

## Violation of A.R.S. § 3-114

### (Applicator Defendants)

94.    The foregoing paragraphs are incorporated by reference.

95.    The Applicator Defendants each knowingly damaged and destroyed the High Fiber Wheat that Calyxt is growing for commercial purposes.

96.    Among other improper actions, the Applicator Defendants failed to add proper thickening agents to the pesticide chemical being sprayed; made improper changes to the applicator nozzle configurations or settings; failed to investigate neighboring fields and susceptible crops located thereon; failed to have the proper spotters for identifying nearby hazards; disregarded local weather conditions (e.g., a temperature inversion); undertook an improper flight path; and/or applied the herbicide at an improper time of day.

97.    The Applicator Defendants either knew or should have known that these actions would damage Calyxt's High Fiber Wheat crops.

98.    The High Fiber Wheat crops are legal.

99.    Calyxt has suffered consequent and proximate damages as a result of the Applicator Defendants' actions in an amount to be determined at trial, for example, through destruction of a significant portion of Calyxt's High Fiber Wheat crops.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

**COUNT VI**

**Violation of A.R.S. § 3-367**

**(All Defendants)**

100.    The foregoing paragraphs are incorporated by reference.

101.    Calyxt timely submitted its written reports pursuant to A.R.S. § 3-367.01.

102.    Calyxt waited at least 60 days after submitting its written reports before filing this claim as required by A.R.S. § 3-367(B)(1) and, therefore, this action is timely.

103.    By causing herbicide to drift onto and damage Calyxt's High Fiber Wheat crops, Defendants violated the following Arizona agricultural statutes and regulations: A.R.S. § 3-114; Ariz. Admin Code Rules R3-3-301(D), R3-3-502(A)(4)-(5).

104.    By engaging in or otherwise causing the application of a herbicide in a manner resulting in drift of the pesticide that caused damages to Calyxt's High Fiber Wheat crops, the Grower, Applicator, and PCA Defendants individually and jointly violated the following Arizona statutes and regulations that were adopted or issued pursuant to Article 6 of the Arizona Revised Statutes governing "Pesticide Control":

a.   A.R.S. § 3-367;

b.   Ariz. Admin. Code R3-3-301(A) ("A person shall not use, apply, or instruct another to apply a pesticide in a manner for a use inconsistent with the pesticide labeling . . . .");

c.   Ariz. Admin. Code R3-3-301(D) ("A person shall not allow drift that causes any unreasonable adverse effect.");

d.   Ariz. Admin. Code R3-3-301(E) ("A person shall not cause the direct release of a pesticide and an individual shall not instruct an applicator in a manner to cause the direct release of a pesticide causing any unreasonable adverse effect.")

e.   Ariz. Admin. Code R3-3-502(A)(5)(c) (listing as violation the application of a pesticide that comes into contact with "[p]roperty, other than the application site being treated");

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

f. Ariz. Admin. Code R3-3-502(A)(6) ("Use, apply or instruct another to apply pesticide in a manner or for a use inconsistent with its pesticide label or labeling . . . .")

105. The Applicator Defendants further violated Ariz. Admin. Code R3-3-502(A)(4) and R3-3-502(E)(1) by operating an aircraft in a faulty, careless, or negligent manner during the application of a pesticide, for which the Grower Defendants are vicariously liable.

106. The PCA Defendants further violated Ariz. Admin. Code R3-3-502(C)(4) by making a written recommendation for the use of a pesticide in a manner inconsistent with its pesticide label not falling under any exception listed by R3-3-301(A).

107. Calyxt has suffered consequent and proximate damages as a result of the Grower, Applicator, and PCA Defendants' actions in an amount to be determined at trial, for example, through destruction of a significant portion of Calyxt's High Fiber Wheat crops.

108. Calyxt is entitled to an award of costs of litigation, including its reasonable attorney and expert witness fees and to an injunction against the Grower, Applicator, and PCA Defendants from further causing damage to Calyxt's High Fiber Wheat crops.

## **PRAYER FOR RELIEF**

WHEREFORE, Calyxt respectfully requests that the Court grant it the following relief:

(a) An award of actual damages in an amount to be proven at trial;

(b) An award of damages pursuant to A.R.S. § 3-114 in the amount of up to twice the market value of the damaged High Fiber Wheat crops as measured before the damage or destruction and twice the actual costs of production, research, testing, replacement and crop development directly related to the damaged High Fiber Wheat crops;

(c) Injunctive relief preventing Defendants from further causing damage to Calyxt's High Fiber Wheat Crops;

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

(d)     An award of attorneys' fees, expert witness fees, and costs in this action pursuant to A.R.S. §§ 3-114, 3-367, or otherwise;

(e)     An award of prejudgment and post-judgment interest;

(f)     For such other and further relief in favor of Calyxt as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Calyxt hereby demands a jury trial on all issues and claims so triable.

RESPECTFULLY SUBMITTED this 18th day of June, 2020.

**BALLARD SPAHR LLP**

By: /s/ *Jonathon A. Talcott*
        Jonathon A. Talcott (030155)
        talcottj@ballardspahr.com
        1 East Washington Street, Suite 2300
        Phoenix, AZ  85004-2555
        Tel:  602.798.5400
        Fax:  602.798.5595

        Karla M. Vehrs (*Pro Hac Vice* Forthcoming)
        vehrsk@ballardspahr.com
        Conor H.M. Smith (*Pro Hac Vice* Forthcoming)
        smithchm@ballardspahr.com
        2000 IDS Center
        80 South 8th Street
        Minneapolis, MN  55402-2119
        Tel:  612.371.3211
        Fax:  612.317-3207

        *Attorneys for Plaintiff Calyxt, Inc.*