**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Calyxt Incorporated, | No. CV-20-01221-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Tri-Roto LLC, Jonhenry Luke, D'Arrigo Brothers Company of California, and Consaul Ranches LLC, | |
| Defendants. | |

Plaintiff Calyxt Inc. ("Calyxt") is suing Defendants Tri-Rotor LLC ("Tri-Rotor"), Jonhenry Luke ("Luke"), D'Arrigo Brothers Company of California ("D'Arrigo"), and Consaul Ranches LLC ("Consaul") (collectively, "Field Two Defendants") for tort and statutory claims arising from an alleged pesticide drift onto Calyxt's crops in 2019. Pending before the Court are two motions to exclude expert witnesses: (1) Field Two Defendants' motion to exclude Plaintiff's expert witness, Michael J. Giroux (Docs. 271, 237, 276), and (2) Field Two Defendants' motion to exclude Plaintiff's expert witness, William W. Wilson (Docs. 272, 239, 275). Additionally, there are three pending motions for summary judgment: (1) Consaul's motion for summary judgment (Docs. 212, 241, 248), (2) D'Arrigo and Consaul's motion for partial summary judgment (Docs. 214, 236, 250); and (3) Field Two Defendants' motion for summary judgment (Docs. 288, 289, 237, 276).[1]

---

[1] Docket Numbers 288 and 289 appear as two pending motions on the docket, but they are in fact the same motion. Docket Number 288 is the sealed motion, and Docket Number 289 is the redacted version of that motion.

The motions are fully briefed.[2] For the following reasons, the Court denies all five motions.

## I. Background[3]

Calyxt is an agricultural company specializing in gene-editing technology for crops like wheat and soybeans. In October 2019, Calyxt planted a genetically engineered high fiber wheat ("HFW") product in two different fields in Yuma, Arizona ("Field One" and "Field Two," respectively). Calyxt claims that in 2019, pesticides sprayed aerially on nearby fields drifted onto Calyxt's two respective fields and destroyed parts of the HFW crops in each field.

Plaintiff alleges two incidents of pesticide drift (collectively, "the Yuma Incident"), one incident affecting Field One and the other affecting Field Two. Field One and Field Two are miles apart. The aerial application near Field One occurred six days prior to the aerial application near Field Two. Moreover, the incidents involve two separate sets of defendants. The Field One incident involved Amigo Farms, Inc. ("Amigo"), Morris AG Air Southwest ("Morris"), and Jeffrey Nigh, all of whom are no longer parties to this suit.[4] The remaining defendants—D'Arrigo, Tri-Rotor, Consaul, and Luke—are all allegedly involved with the pesticide drift onto Field Two.

## II. Motions to Exclude Expert Witnesses

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A witness who is qualified as an expert may testify in the form of an opinion if the proponent demonstrates to the Court that it is more likely than not that:

> (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion

---

[2] Calyxt's request for oral argument is denied because the issues are adequately briefed, and oral argument will not assist the Court in reaching its decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

[3] This section provides a brief background. Additional facts are mentioned below where relevant.

[4] Calyxt and Morris settled all claims between them. (Doc. 261.) The Court granted Calyxt's motion for entry of judgment against Amigo and Nigh on September 26, 2023. (Docs. 266, 268.)

- 2 -

> reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. A trial court functions as a "gatekeeper," excluding expert opinions if they do not meet the requirements of relevance and reliability under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). A court accomplishes this by making a preliminary determination that an expert's testimony is both relevant and reliable. *Id.* at 585–95. Rejection of expert testimony, however, remains "the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note (2000 amendments).

"The inquiry envisioned by Rule 702" is a "flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* "[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Fed. R. Evid. 702 advisory committee's note (2000 amendments) (cleaned up).

### B. Field Two Defendants' Motion to Exclude Dr. Michael J. Giroux

Dr. Giroux is a plant geneticist and breeder and has a Ph.D. in plant molecular and cellular biology. Currently, he is a professor and department head of the Plant Sciences and Plant Pathology Department at Montana State University. Calyxt retained Dr. Giroux to opine on the reasonableness of Calyxt's actions in developing its HFW product, both before and after it suffered damage from the alleged 2019 drift, and on the agronomic importance of Calyxt's HFW project. (Doc. 231–7.)

Field Two Defendants challenge four parts of Dr. Giroux's opinion: (1) that Calyxt's HFW product is "valuable" and "innovative;" (2) that the Yuma Incident killed Calyxt's most desirable wheat lines; (3) that Calyxt's HFW development plan post-Yuma Incident was reasonable; and (4) that Calyxt followed industry standards in developing its HFW product. Field Two Defendants do not challenge the reliability of Dr. Giroux's methods or his application of such methods. Rather, they contend that Dr. Giroux is not qualified to opine on the value of Calyxt's HFW and that Dr. Giroux's remaining opinions are based on insufficient facts and data. (Doc. 271.) The Court disagrees.

There is no dispute that Dr. Giroux has specialized technical expertise in wheat genetics and breeding. Field Two Defendants assert, however, that because Dr. Giroux is not an economist, he cannot testify about the "value" of Calyxt's HFW. Not so. Dr. Giroux's opinion on Calyxt's product is based on his own knowledge, experience, and research in plant genetics and breeding and not, as Field Two Defendants contend, some unfounded understanding of the economy. In drawing his opinion, Dr. Giroux noted that starch-based foods with increased resistant starch are associated with a variety of health benefits and that wheat products account for approximately 50% of resistant starch consumed in the United States. (Doc. 291-1.) Dr. Giroux then examined Calyxt's development of its HFW product, looking at the specific gene-editing methods Calyxt employed to increase the concentration of fiber in its crops. Dr. Giroux's opinion that Calyxt's product is innovative and valuable pertains to the methods Calyxt used to develop its product as well as Calyxt's goal of developing a wheat line with increased dietary fiber.

As a plant geneticist, Dr. Giroux is qualified to opine about the import of developing higher-fiber wheat crops. Contrary to Field Two Defendants' assertion, Dr. Giroux need not be a trained economist to be sufficiently qualified to understand and opine about the wheat industry and to conclude that higher-fiber foods are valuable products. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) ("*Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.") (internal quotation marks omitted).

The Court also finds that Dr. Giroux's opinion is based on sufficient facts and data. Dr. Giroux reviewed case pleadings and discovery materials submitted by each party, including written discovery responses, deposition testimony, exhibits, and documents produced in the case. These materials detailed, among other things, Calyxt's HFW genetic selection and breeding process (including the specific gene-edits Calyxt used); Calyxt's planting strategy (such as what seed lines were planted, how much was planted, and where the lines were planted); the testing and analysis of Calyxt's HFW; and the phased design

of Calyxt's commercialization plan. Dr. Giroux also relied on his own as well as outside academic research and studies to support his findings. (Doc. 291-1.)

Field Two Defendants argue that Dr. Giroux's opinion on the value of Calyxt's product is based on a speculative assumption that consumers want to eat higher dietary foods. They neglect, however, Dr. Giroux's report, which sufficiently supports such an assumption with research and data.[5] Though Field Two Defendants may disagree with the premise that consumers desire higher-fiber foods, Calyxt has demonstrated by a preponderance of the evidence that Dr. Giroux's opinion is based on sufficient facts and data and therefore falls within the bounds of Rule 702.

The remainder of Field Two Defendants' arguments as to why Dr. Giroux's opinion should be excluded go to the weight rather than the admissibility of his testimony. For instance, Field Two Defendants argue that Calyxt's other retained expert, Dr. Khatib, contradicts Dr. Giroux about the time frame that Calyxt's HFW would need to emerge after being planted; that Dr. Giroux did not examine breeding techniques that Calyxt's competitors use; and that Dr. Giroux did not review certain documents related to Calyxt's development plan post-Yuma Incident. (*See* Doc. 291.) The Court is not persuaded that these points demonstrate that Dr. Giroux's opinions are baseless but rather are issues to be explored on cross-examination of the witness. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross examination, presentation of contrary evidence, and careful instruction on

---

[5] Field Two Defendants emphasize that Dr. Giroux testified in his deposition that his opinion about the value of Calyxt's product assumes that Americans want to purchase foods with a higher fiber, which in turn is based on his "knowledge as a consumer and as a scientist that studies wheat quality." (Doc. 291 at 5.) Field Two Defendants cherry pick specific lines out of Dr. Giroux's deposition to assert that his opinions lack a sufficient basis. The Court is not persuaded. Giroux was not required to cite during his deposition every single piece of research he reviewed or studied. Indeed, a look at Dr. Giroux's report reveals that he sufficiently supports this assumption that Americans desire higher-fiber foods with research and data. (291-1 at 32–33.) Further, even if Dr. Giroux had not provided such citations, Dr. Giroux's extensive study of and experience in wheat breeding is sufficient for him to opine on the growing importance of developing higher-fiber foods for American diets.

the burden of proof—to attack shaky but admissible evidence.") Accordingly, the Court denies Field Two Defendants' motion to exclude Plaintiff's expert witness, Dr. Michael J. Giroux (Doc. 271).

### C. Field Two Defendants' Motion to Exclude Dr. William W. Wilson

Dr. William W. Wilson, Ph.D. is a professor of Agribusiness and Applied Economics at North Dakota University. Calyxt retained Dr. Wilson to opine on the approximate amount of damages it incurred due to the Yuma Incident. Field Two Defendants do not challenge Dr. Wilson's qualifications or credentials. (Doc. 272.) Nor do they challenge his general methodology for calculating damages—using an empirical model to derive the estimated damages using standard net present value analysis. (*Id.*; s*ee also* Doc. 292-1 at 4.) Rather, Field Two Defendants challenge five assumptions that Dr. Wilson made in computing the estimated damages: (1) that the Yuma Incident was the sole cause of the one-year delay in Calyxt's commercialization of its HFW; (2) that HFW will comprise 45% of the domestic wheat market by 2028; (3) that 2022 is the appropriate start date for the logistics market adoption curve model; (4) that Calyxt's HFW product would capture one-third of the HFW market share; and (5) the royalty fee for Calyxt's HFW product. (Doc. 272.) Field Two Defendants argue that these assumptions are incorrect and speculative, and therefore Dr. Wilson's damages estimation grossly overstates Calyxt's alleged injury.

Turning to Field Two Defendants' first argument: they assert that Dr. Wilson failed to consider other potential setbacks that could have caused the one-year delay in commercialization and this failure is fatal to the reliability of Dr. Wilson's opinion. The Court disagrees. Whether other potential setbacks could have caused the one-year delay is an issue related to causation. Yet, Dr. Wilson was not retained to opine on causation; his opinion was limited to providing an approximate estimation of damages. "It is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages." *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-1370, 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018); s*ee also Bakst v. Cmty. Mem'l Health*

*Sys., Inc.*, No. CV 09-08241 MMM, 2011 WL 13214315, at *17 (C.D. Cal. March 7, 2011) (surveying cases).

As to the remaining four assumptions that Field Two Defendants challenge, any criticisms go to the weight of Dr. Wilson's opinion, not the admissibility. Although other assumptions could have been made, this does not render Dr. Wilson's opinion so fundamentally flawed that it could be of no assistance to the jury on the issue of damages. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility."). Each of the assumptions Dr. Wilson makes—the market share of HFW, the start date for the adoption curve, Calyxt's capture of the market, and Calyxt's royalty fee—is sufficiently explained and supported by facts and data. (*See e.g.*, Doc. 192-1 ¶¶ 155–57 (explaining logic behind assumption that Calyxt will capture one-third market share)). If, indeed, such assumptions are erroneous, Field Two Defendants may address these issues via cross examination and a presentation of opposing evidence. As such, the Court denies Field Two Defendants' motion to exclude Plaintiff's expert witness, Dr. William W. Wilson (Doc. 272).

**III.   Motions for Summary Judgment**

As noted earlier, there are three pending motions for summary judgment: Consaul's motion for summary judgment (Doc. 212); D'Arrigo and Consaul's motion for partial summary judgment (Doc. 214); and Field Two Defendants' motion for summary judgment (Docs. 288, 289). The Court will first address the motion for summary judgment on Calyxt's strict liability claim (Count I), which is an argument that Field Two Defendants join but is contained in Consaul's motion for summary judgment (Doc. 212). After resolving the strict liability claim, the Court will address each motion in turn.

**A. Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material

1 if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, the party seeking summary judgment bears the initial burden of informing the Court of the "basis for its motion, and identifying those portions of the [record] which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotations omitted). The burden then shifts to the non-movant to establish the existence of a genuine dispute of material fact. *Id.* at 324. The non-movant may not simply rest upon the allegations of its pleadings. Rather, the non-movant must point to "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Furthermore, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation and citation omitted).

## B. Calyxt's Strict Liability Claim (Count I)[6]

Calyxt alleges that Field Two Defendants are strictly liable because they "were engaged in the inherently dangerous activity of aerially applying pesticides in fields that were close in proximity to Calyxt's [HFW] crops." (Doc. 92 ¶ 70.) Field Two Defendants contend that Calyxt's strict liability claim fails as a matter of law because although aerial crop spraying may be an inherently dangerous activity, "a strict liability theory, based on the Restatement (Second) of Torts § 519, is available only against someone who engages in abnormally dangerous activities."[7] (Doc. 212 at 4.) Field Two Defendants assert that no

---

[6] Though this argument is made in Consaul's motion for summary judgment (Doc. 212), the argument is made on behalf of Field Two Defendants.
[7] In passing, Field Two Defendants also argue that Calyxt failed to plead in its Complaint that Field Two Defendants engaged in an abnormally dangerous activity. The

- 8 -

Arizona court "has recognized aerial crop spraying as an 'abnormally dangerous' activity for purposes of imposing strict liability and, indeed, aerial crop spraying does not qualify as an abnormally dangerous activity under the factors listed in Restatement § 520." (*Id.* at 5.)

"The law of abnormally dangerous activities traditionally contemplates a hazardous activity occurring in a specific place which causes harm to others in some geographic proximity." *Gaston v. Hunter*, 588 P.2d 326, 341 (Ariz. Ct. App. 1978). Whether an activity is "abnormally dangerous" is a question of law for the Court. *Cordova v. Parrett*, 703 P.2d 1228, 1231 (Ariz. Ct. App. 1985). A court considers the following factors in determining whether an activity is abnormally dangerous:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520; *see also id.*

Field Two Defendants are correct that although the Arizona Court of Appeals has found that aerial crop spraying constitutes an "inherently dangerous" activity,[8] no Arizona court has found that it constitutes an "abnormally dangerous" activity. Nonetheless, "[t]he Restatement requires the [C]ourt to conduct a case-by-case analysis before imposing strict liability." *Perez v. S. Pac. Transp. Co.*, 883 P.2d 424, 425 (Ariz. Ct. App. 1993).

Field Two Defendants fail to meet their burden of establishing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Although there are six factors under § 520 of the Restatement that a court must consider in determining whether an activity is abnormally dangerous, Field Two Defendants only address two of the factors: whether the activity involves a risk of "great" harm and whether

---

Court disagrees and finds that Calyxt sufficiently alleged facts supporting such a claim. (*See* Doc. 92 ¶¶ 40–49, 52, 57–60, 69–73, 87.)

[8] *See Pride of San Juan, Inc. v. Pratt*, 212 P.3d 29, 32–33 (Ariz. Ct. App. 2009).

such a risk can be eliminated through the exercise of reasonable care. (Doc. 212 at 6–7.) Moreover, both factors that Field Two Defendants address involve material issues of fact.

First, Field Two Defendants contend that because the pesticide at issue, Clethodim, is an EPA-approved and regulated pesticide, aerial spraying of Clethodim does not involve a risk of "great" harm. (*Id.*) Yet Field Two Defendants provide no support for the assertion that EPA approval of a substance is sufficient to demonstrate that an activity involving such a substance poses no risk of great harm. Indeed, when a court conducts a "case-by-case" analysis for abnormally dangerous activities, the "properties of the particular substance involved are not determinative, rather the defendant's activity as a whole is analyzed." *Perez*, 883 P.2d at 426. That Clethodim has "EPA approval" does not demonstrate beyond dispute that aerially spraying Clethodim is an activity with no great risk of harm.

Furthermore, in its response, Calyxt points to evidence that "spray drift can be hazardous to non-targets" and that "it's impossible to completely eliminate all driftable fines." (Doc. 241 at 9, citing Doc. 212 at 131.) The Court finds there is a genuine dispute as to whether the aerial application of Clethodim involves a great risk of harm.

Second, Field Two Defendants assert that because spray drift can be "reduced to a de minimus [sic] level at which biological effects are negligible," the third factor of § 520—whether the exercise of reasonable care eliminate the risk of harm—weighs against the abnormally dangerous classification. (Doc. 212 at 6.) Field Two Defendants appear to equate a negligible risk of harm with the elimination of such risk, yet commentary to the Restatement explains that third factor refers to the "unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation." Restatement (Second) of Torts § 520, cmt. h. The commentary further explains that "[t]here is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on." *Id.* In other words, most ordinary activities can be made

*entirely* safe by the taking of all reasonable care. Here, however, there is evidence that although the dangers of aerially spraying pesticides may be mitigated, it is impossible to "completely eliminate driftable fines." (Doc. 241-4 at 7; *see also* Doc. 212 at 131.) Field Two Defendants even acknowledge as such, conceding that "spray drift cannot be completely eliminated from pesticide application." (Doc. 212 at 6.) So, again, there is a genuine dispute of fact, this time with respect to whether the exercise of reasonable care can eliminate the risk of harm associated with aerially spraying pesticides. Accordingly, although whether an activity is abnormally dangerous is a question of law, the Court denies Field Two Defendants summary judgment on Calyxt's strict liability claim (Count I) because the facts necessary to make this legal determination are genuinely disputed, and because Field Two Defendants, in neglecting to address most of the relevant factors, have not shown that they are entitled to judgment as a matter of law.

### C. Consaul's Motion for Summary Judgment

Consaul moves for summary judgment on all of Calyxt's claims against it, arguing that the claims fail as a matter of law for two reasons: (1) because Consaul did not employ Tri-Rotor, the aerial applicator of the pesticides, Consaul cannot be held vicariously liable for the alleged drift onto Field Two; and (2) Consaul did not engage in any affirmative act that could have proximately caused Calyxt's alleged injury and therefore cannot be liable for any of the claims. (Doc. 212.) The Court disagrees.

By way of background: Consaul is a "grower" of crops. Consaul did not and does not own the field adjacent to Calyxt's Field Two, but instead subleased the field from a third party, who in turn leased the field from the landowner. (Doc. 212 at 24.) D'Arrigo is a produce shipper and distributor. Consaul and D'Arrigo entered into a "growing" contract, whereby Consaul "agrees to grow and D'Arrigo agrees to purchase" a certain number of acres of produce. (Doc. 241-2.) The contract provides that Consaul "agrees to grow and properly care for said crop . . . performing all necessary cultural practices . . . while growing in accordance with applicable laws and regulations" and that Consaul "will, at all times, observe Federal and State regulations with respect to residual and dosage and will

apply only those . . . herbicides specifically cleared by Federal and State agencies for use on this crop." (*Id.*)

Calyxt and Consaul dispute whether Consaul's contract with D'Arrigo actually reflects which party was responsible for the aerial application of the pesticides. Consaul contends that, despite the contract stating otherwise, D'Arrigo—not Consaul—"controlled all aspects of the growing process." (Doc. 212 at 2–3.) Consaul points to testimony by Doug Consaul, Consaul's president and owner, in which he denies making decisions or providing input on the aerial application of the pesticides, as well as testimony by Paul Nelson, a representative of D'Arrigo, in which Nelson states that Consaul was not responsible for spraying pesticides. (*Id.* at 26, 31.) Consaul further asserts that rather than consulting with Consaul on the aerial application, D'Arrigo consulted pest control advisor, Luke, who provided D'Arrigo with recommendations and instructions regarding the aerial application of pesticides. (*Id.* at 3, 26, 111.) Then, after consulting Luke, D'Arrigo hired Tri-Rotor, an aerial applicator company, to spray the field. (*Id.* at 112.)

In addition to strict liability, Calyxt asserts the following claims against Consaul: negligent trespass (Count II), negligence per se (Count III) (addressed separately *infra*), private nuisance (Count IV), and an award of costs of litigation under A.R.S. § 3-367 (Count VI).[9] (Doc. 92.)

Consaul contends that it cannot be held vicariously liable for Luke or Tri-Rotor's conduct because it did not employ either of them. (Doc. 212 at 7–8.) Consaul notes that under the Restatement (Second) of Torts § 427, an employer can be vicariously liable for the negligence of an independent contractor[10] hired to perform "inherently dangerous work."[11] Consaul concedes that that the aerial spraying of pesticides may be "inherently

---

[9] A.R.S. § 3-367 provides a private right of action to any person whose interest is adversely affected by another's violation of Arizona's pesticide control statutes and regulations. Under § 3-367(D), the Court may award the costs of litigation. In its Complaint, Calyxt alleges that Consaul is vicariously liable for these costs. (Doc. 92 ¶ 102.)

[10] The parties do not appear to dispute that Luke and Tri-Rotor were hired as independent contractors and not as employees.

[11] Consaul mistakenly argues that § 427 of the Restatement only applies to a "land possessor" who employs an independent contractor to perform inherently dangerous work. Although a land possessor can be vicariously liable under this section, § 427 is not limited to land possessors but instead applies to any employer who engages such a contractor. *See*

- 12 -

dangerous" work but asserts that it is undisputed that D'Arrigo, not Consaul, hired Luke and Tri-Rotor. The Court disagrees.

Though Consaul points to contrary evidence, Consaul's contract with D'Arrigo purports to impose on Consaul the responsibility of the "growing process," including the spraying of pesticides. Thus, construing the evidence in a light most favorable to Calyxt, the Court finds there is a genuine dispute as to whether Consaul hired or played a role in the hiring of Luke and Tri-Rotor and, in turn, whether Consaul can be held vicariously liable for their conduct. Accordingly, the Court denies Consaul's motion for summary judgment (Doc. 212) on Calyxt's claims for negligent trespass (Count II), private nuisance (Count IV),[12] and an award of costs of litigation under A.R.S. § 3-367 (Count VI). *See S.A. Gerrard Co. v. Fricker*, 27 P.2d 678, 680 (Ariz. 1933) (holding that employer of independent contractor cannot escape liability for pesticide spray spreading to adjoining premises); *see also Sanders v. Beckwith*, 283 P.2d 235 (Ariz. 1955) (holding landowner liable for damages caused by crop dusting to adjacent property based on negligent trespass).

### D. D'Arrigo and Consaul's Motion for Partial Summary Judgment

D'Arrigo and Consaul (collectively, "Grower Defendants") argue that they are entitled to judgment on Calyxt's negligence per se claim because (1) as a matter of law, Grower Defendant cannot be vicariously liable for Luke or Tri-Rotor's negligence per se

---

Restatement (Second) of Torts § 427 ("One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.").

[12] Consaul does not argue whether a theory of vicarious liability can apply to a private nuisance claim. Though the Court is not aware of an Arizona case discussing this, § 427B of the Restatement (Second) of Torts appears to endorse such a proposition. Restatement (Second) of Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance."); *see also Quiroz v. ALCOA Inc.*, 416 P.3d 824, 834 (Ariz. 2018) ("We generally follow the Restatement unless it conflicts with Arizona law."). Nevertheless, even if vicarious liability cannot attach to a claim for private nuisance, genuine issues exist as to Consaul's role and involvement in the spraying of the field. *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 712 P.2d 914, 920 (Ariz. 1985) (holding that "liability for nuisance may be imposed upon one who sets in motion the forces which eventually cause the tortious act").

- 13 -

and (2) Grower Defendants were not involved in the application of the pesticides and therefore cannot be directly liable for negligence per se. (Doc. 214.) The Court disagrees.

Grower Defendants contend that although a principal is liable for an independent contractor's negligence where the work involves an "inherently dangerous activity," no Arizona court has held a principal liable for an independent contractor's negligence per se. In other words, though Grower Defendants may be held vicariously liable for Luke and Tri-Rotor's negligence, they cannot be held vicariously liable for Luke and Tri-Rotor's negligence per se. The Court is not persuaded.

Under Arizona law "[n]egligence per se is not a cause of action separate from common law negligence. It is a doctrine under which a plaintiff can establish the duty and breach elements of a negligence claim based on a violation of a statute that supplies the relevant duty of care." *Craten v. Foster Poultry Farms Inc.*, 305 F. Supp. 3d 1051, 1054 n.2 (D. Ariz. 2018). As a matter of law, then, Grower Defendants could be vicariously liable for Luke and Tri-Rotor's negligence per se if Luke and Tri-Rotor's activity is inherently dangerous and violates a statute supplying the relevant duty of care.

Here, there are genuine issues of fact as to (1) whether Luke and Tri-Rotor violated statutes potentially supplying relevant duties of care and (2) whether aerially spraying pesticides is an inherently dangerous activity. Accordingly, the Court denies Grower Defendants' motion for partial summary judgment (Doc. 214).

**E. Field Two Defendants' Motion for Summary Judgment**

In the last pending motion for summary judgment (Docs. 288, 289), Field Two Defendants contend that they are entitled to judgment as a matter of law on all claims asserted against them because Calyxt has failed to proffer evidence that Field Two Defendants caused Calyxt's claimed damages. The Court finds there is a genuine dispute of fact and thus summary judgment is, again, improper.

As noted at the start, this case arises from two incidents of pesticide drift, one affecting Field One and the other affecting Field Two. Each incident of pesticide drift was allegedly caused by a different set of defendants: one set of defendants adjacent to Field

1  One (Field One Defendants, who are no longer parties to this suit) and a second set adjacent
2  to Field Two (Field Two Defendants, who are bringing this motion).

3  As relevant here: Calyxt intended to use the HFW variety growing on Field One for
4  a commercial launch in 2022, and the HFW on Field Two for second and third product
5  launches in subsequent years following the 2022 launch. (Doc. 289-4.) Calyxt asserts that
6  although the HFW from Field One and Field Two were going to be launched in separate
7  years, both fields were part of a single commercialization strategy. In discussing Calyxt's
8  commercialization strategy, Chloe Pavely, a Fed. R. Civ. P. 30(b)(6) witness on behalf of
9  Calyxt, explained: "[T]he way you bring a product to market is through a comprehensive
10 launch where you plan your immediate launch, but then you have to have . . . that line in
11 other varieties in order to have adequate product offering on year two. So you start small,
12 but on year two, year three, you have to expand, and you need to start planning that early."
13 (Doc. 238-5.) Dr. Giroux also explained that "the Field [One] crosses were to allow Calyxt
14 to get to market with a product fastest, with the Field [Two] backcross following later with
15 superior performance from the elite lines. Both [Fields] are critical to keeping the product
16 line continuously improving as is typical for the breeding program for [a] new product,
17 with the fastest first to market and followed by continuous improvement." (Doc. 291-1
18 ¶ 107.)

19 Calyxt asserts that because of the alleged drift in 2019, it experienced a one-year
20 delay in the launch of its HFW growing on Field One. Based on this delay in
21 commercialization, Dr. Wilson—Calyxt's damages expert—used an empirical model to
22 estimate Calyxt's damages. Importantly—and what Field Two Defendants focus on in the
23 instant motion—Dr. Wilson's model did not calculate Calyxt's economic damages for each
24 field separately. Rather, his model assumed that the HFW on Field One and Field Two
25 were part of an "overall breeding strategy designed for commercialization." (Doc. 238-8.)
26 In turn, because Fields One and Two comprised a single commercialization strategy, Dr.
27 Wilson's model did not distinguish between the fields and instead computed a single
28 estimated damages amount based on the one-year commercialization delay. (Doc. 238-8.)

1   Field Two Defendants contend that Dr. Wilson's model fails to measure the damages allegedly caused by Field Two Defendants. They note that Dr. Wilson's model calculates damages based on the one-year delay in the launch of the HFW from Field One, yet there is no evidence that Field Two Defendants had any involvement in the pesticide application adjacent to Field One or that they played a causal role in the delay of the Field One HFW launch. In other words, Field Two Defendants contend that Calyxt has failed to proffer evidence linking the injury it suffered—the economic damages stemming from the one-year commercialization delay—to Field Two Defendants' alleged wrongful acts. (Doc. 288.)

Calyxt, on the other hand, argues that because "the HFW in Field [One] and Field [Two] was a single product, and given the temporal proximity of all Defendants' acts, damages to Calyxt's HFW resulting from the [2019 drifts] cannot be reasonably separated out." (Doc. 238 at 11.) Calyxt further asserts that whether an injury is indivisible and how to apportion fault among multiple parties are questions of fact for a jury to decide. (Doc. 238 at 11.) The Court agrees.

Although this case involves two HFW fields, miles apart from one another, that allegedly suffered pesticide drifts on two separate dates by two separate sets of defendants, Calyxt has proffered sufficient evidence to create a genuine dispute as to whether Field Two Defendants' alleged wrongdoing contributed to Calyxt's damages. Under Arizona law,

> When damages cannot be apportioned between multiple tortfeasors, there is no reason why those whose conduct produced successive but indivisible injuries should be treated differently from those whose independent conduct caused injury in a single accident. . . . [There is] no reason to employ a different rule if the injuries occur at once, five minutes apart or . . . several hours apart. The operative fact is simply that the conduct of each defendant was a cause and the result is indivisible damages.

*Piner v. Superior Ct. In & For Cnty. of Maricopa*, 962 P.2d 909, 916 (Ariz. 1998); *see also A Tumbling-T Ranches v. Paloma Inc. Ltd. P'ship*, 5 P.3d 259, 266 (Ariz. Ct. App. 2000) (noting that indivisible injury rule applies to both multiple causation and successive injury

cases and that once a plaintiff proves that the defendants' conduct contributed to plaintiff's damages, the burden of proof shifts to the defendants to apportion damages). Here, there is evidence that Calyxt intended for the HFW on Field One and Two to be single product—that although the HFW varieties were to be launched in successive years, the respective launches comprise a singular, continuous process whereby harm to one variety of HFW has compounding effects on the product as a whole. Thus, viewing the evidence in a light most favorable to Calyxt, a jury could reasonably infer that because the HFW is one product, pesticide drift onto either Field One or Field Two—such that part of the HFW variety is destroyed—would delay the launch of the entire product, not merely the launch of one variety of wheat in a particular year.

There is genuine issue of fact regarding whether Calxyt suffered an indivisible injury and therefore summary judgment is not appropriate. Field Two Defendant' motion for summary judgment (Docs. 288, 289) is denied.

**IT IS ORDERED** that Field Two Defendants' Motion to Exclude Plaintiff's Expert Witness Michael J. Giroux (Doc. 271), Motion to Exclude Plaintiff's Expert Witness William W. Wilson (Doc. 272), and Motion for Summary Judgment (Docs. 288, 289) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Consaul Ranches, L.L.C.'s Motion for Summary Judgment (Doc. 212) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants D'Arrigo Brothers Company of California and Consaul Ranches, L.L.C.'s Motion for Partial Summary Judgment (Doc. 214) is **DENIED**.

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** that the parties shall appear for a telephonic trial scheduling conference on **June 20, 2024, at 10:00 a.m.** (Arizona time). Call-in instructions will be provided via separate email.

Dated this 23rd day of May, 2024.

Douglas L. Rayes
United States District Judge